W. D. Starbird, appellee, v. J. H. McShane Timber Company et al., appellants.

Filed June 16, 1913.    No. 17,152.

1. Brokers: Commissions. One who is employed by another to sell specified property at a stated price and for an agreed compensation for making such sale, but has no exclusive contract of agency, other persons with his knowledge being likewise authorized to make such sale with the same agreement as to compensation, cannot recover the stipulated commission upon sale being made by others so employed, although his own efforts may have contributed to the result.

2. ———: Action for Commission: Pleading. Neither the pleadings nor the evidence in this case will support a judgment for the value of the plaintiff's services in assisting to make a sale of the property.

Appeal from the district court for Douglas county: Willis G. Sears, Judge. Reversed.

Isaac E. Congdon, for appellants.

De Bord, Fradenburg & Van Orsdel, contra.

Sedgwick, J.

During the year 1907 the J. H. McShane Timber Company, a corporation, owned property and a business in the Big Horn mountains in Wyoming, which had cost the company about $400,000. The capital stock of the company was $250,000, all of which was held by J. H. and F. J. McShane. In the beginning of the year the company was largely involved in debt and the business was unprofitable and very much embarrassed. It became apparent that the business could not be continued and that a sale of the entire property and business would soon become unavoidable. This plaintiff had been conducting a somewhat similar business in Idaho, and was contracting for one in the state of Washington. He heard incidentally that the McShanes were anxious to sell their property

and business, and wrote them that he had heard that they
desired to sell and suggested that he might be of assist-
ance to them.   Afterwards it was suggested to the Mc-
Shanes by a former owner of the property that this plain-
tiff might be able to effect a sale.   The McShanes requested
the plaintiff to meet them at the property, and a verbal
understanding was arrived at between them under which
the plaintiff became very much interested in assisting the
McShanes in placing and keeping the property and busi-
ness in condition to sell and in finding a purchaser.
There was at that time no definite contract between them
as to compensation to the plaintiff for his services, but it
seems to have been understood that the plaintiff was au-
thorized to sell the property, and he was promised if he
succeeded in making such sale that he would be amply
paid therefor, "more money than he had ever had."   With
this indefinite understanding the plaintiff, who appears
to be an active man and to have had some experience and
a large acquaintance with parties who might be expected
to become purchasers of such property, gave considerable
time and attention to the undertaking of selling the prop-
erty and in assisting the McShanes in so doing.   In the
meantime the condition of the business did not improve.
Matters continually grew worse.   The McShanes became
desperately anxious to sell.   The plaintiff demanded a
definite agreement as to his authority in the matter, and
in March, 1908, the timber company gave him a memoran-
dum in which they agreed to sell the whole property to the
plaintiff for the sum of $260,000.   The memorandum con-
cluded with these words: "The intent of this instrument
is an option of purchase, and is and shall remain in force
until July 1, 1908."   Afterwards the McShanes executed
a writing whereby they gave the plaintiff "the right, priv-
ilege and option" up to January 1, 1909, of selling the
entire capital stock of the company for a price therein
stated, and agreed to pay him $25,000 for making such
sale.   At the same time they executed a writing, which
is called a supplemental instrument, in which they re-

ferred to the last-named writing, and extended it to April 1, 1909, and included, not only the stock of the company, but all of its property rights also. Both of these writings bore the same date and appear to have been delivered together in September, 1908.

In November, 1908, the creditors became insistent, and the McShanes became unable to obtain further money or supplies so as to continue the operation of the plant. They were indebted to the First National Bank of Omaha in the sum of $74,000, and to Paxton & Gallagher in about the sum of $25,000 for supplies, and to the Bank of Commerce of Sheridan, Wyoming, in a large amount. When Paxton & Gallagher refused to furnish supplies, Mr. McShane appears to have stated to Mr. Pearce, their manager, the condition of the company's affairs, and informed Mr. Pearce that it was impossible for them to continue the business, and suggested that it would be better to go into bankruptcy or have a receiver appointed. Mr. Pearce suggested that it would be better to turn the property and assets over to trustees to hold and manage the same for the creditors, and upon this suggestion a contract was entered into appointing Mr. Pickens, of Paxton & Gallagher, Mr. Davis, the first vice-president of the First National Bank, and Mr. Perkins, president of the Bank of Commerce of Sheridan, as trustees, and all of the property was assigned to them in that capacity. The trustees took possession of the property in November, 1908, and continued the business. In January, 1909, the property was sold to McPherson & McLaughlin for $182,850. While this sale was being consummated, this plaintiff served notice on all the parties interested that he claimed a commission of $25,000 if the property was sold, and afterwards the plaintiff began this action in the district court for Douglas county against J. H. and F. J. McShane and the McShane Timber Company and the three trustees to recover the $25,000 commission. Upon the trial, when the evidence was completed, the trustees moved for an instructed verdict in their favor. The McShanes

9

and the McShane Timber Company moved for an instructed verdict in their favor. The plaintiff dismissed his action as to the trustees, and moved for an instructed verdict in his favor against the McShanes and the McShane Timber Company. The court thereupon dismissed the action as against the trustees and discharged the jury, and afterwards rendered a judgment in favor of the plaintiff against the McShanes and the McShane Timber Company for $18,798, and the defendants have appealed.

The action was based upon the contract, authorizing the plaintiff to sell the property, to recover the $25,000 agreed commission for doing so. There was no allegation of the value of the plaintiff's services. The plaintiff insists that there is sufficient evidence of the value of the services to support the judgment, and also insists that under the evidence the plaintiff was entitled to the full sum of $25,000, and that the defendants cannot complain of the judgment for a less amount. With the contracts above stated between the plaintiff and McShane, the latter employed the plaintiff to assist in the management of the business and care of the property, and to put it in condition to sell. They paid him $300 a month, and agreed that his salary should begin from the preceding January. They also paid all of his expenses incurred either in the care of the property or in endeavor to sell. The plaintiff insists that the salary was paid him because the employment would require him to employ a man to manage his business, and that plaintiff gained nothing by receiving this salary. But the plaintiff testified that in May, 1907, he was operating a lumber plant in Chance, Idaho, and "had gotten out all our timber and still had all of our property, and I was undertaking to get our money out of it, and was tied up in another contract I was figuring on." He closed this latter contract by purchasing a mill at Springdale, Washington. He says that his plant at Springdale was to "start up" April 1, 1909. He looked after his personal interests himself, and there is no evidence that he employed a man in his place or was put to

any expense in that regard. As we have already stated, his first contract of March 28, 1908, was merely an option to purchase the property for a fixed price of $260,000, and was to remain in force until July 1, 1908. The contract for commission for selling the property upon which he sues, which was dated a few days later, fixed the value of the property at which he was authorized to sell at a somewhat less figure. This price was fixed upon careful inventories of cash values estimated by plaintiff himself, and was about $250,000. He was not engaged in the business of a broker, and had no advantages for securing purchasers such as a clientage of a broker's agency might have supplied. McShane agreed to give Mr. McPherson the same commission if he would sell the property. He made the same agreement with several others. The plaintiff had no exclusive agency to sell the property. No doubt this employment with a salary was dependent upon the more important matter of selling the business. McPherson, who was also promised $25,000 if he should make a sale of the property, appears to have been very active in the matter. He knew that the property was about to be sacrificed and was ready to take an interest in it himself, but did not want to undertake the purchase alone, and afterwards did actually purchase it from the trustees with Mr. McLaughlin. Mr. McLaughlin was engaged in similar business in another location, and when the property was offered to him for $250,000 he expressed himself as unwilling to pay more than $225,000, and afterwards reduced this from time to time, and finally made the definite offer of $180,000 for the property. The contract with the trustees gave them full power to sell the property for such price and upon such terms as they found to be in the interest of the creditors. It was provided that the McShanes might make contracts for the sale of the property subject to the approval of the trustees. At a meeting in Omaha in January, 1909, with McPherson and McLaughlin, at which the trustees and others interested were present, including Mr. J. H. McShane, a contract of sale was made by the trus-

tees to McPherson & McLaughlin. McShane had understood
that these purchasers would pay at least $200,000 for the
property, and when they proposed to pay only $180,000
he protested. The trustees finally offered to accept $182,-
500, with a few dollars added as expenses, and McShane
at once left them, declaring that that amount would not
be sufficient to pay the indebtedness. In this he appears
to have been right. The indebtedness largely exceeded
the amount of the sale. This plaintiff was not present
when the sale was made. It does not appear that the
purchasers or the trustees, or any of them, knew that the
plaintiff had any contract for a commission, nor that he
was employed to make a sale. They seem to have under-
stood that the plaintiff was employed at a salary, and
supposed that that was the extent of his relation to the
business. When the property was turned over to the
trustees they contracted with the plaintiff to continue in
their employment, so that he had notice of the assignment
and of the duties and powers of the trustees. He knew
that, while these defendants were still interested in the
property and in bringing about as advantageous a sale as
possible, no sale of the property could be made except by
or through the trustees, and of course his power to act
was limited accordingly. When it was found that the
property could not be sold for the price for which the
plaintiff had been authorized to sell it, and that it must
be sold for some price, no new agreement was made au-
thorizing him as agent to sell for a lower price, and yet
these defendants continued to avail themselves of his
efforts to secure a purchaser for the property.

We have attempted to state the facts sufficient to show
in a general way the nature of the plaintiff's employment
and the necessary construction of his contract. Neither
the plaintiff nor any one of the other parties authorized
by the McShanes to sell the property nor Mr. McShane
himself can be said to have done so. How much the efforts
of any one of them contributed to the result it is difficult to
determine. The sale was consummated and closed by the

trustees.  They never employed nor authorized this plaintiff to sell the property.  Under these circumstances, it seems clear that it cannot be said that the plaintiff has sold this property and so became entitled to the stipulated sum that was to be paid him if he made such sale.  On the other hand, it was not the understanding of the parties that the salary paid to the plaintiff should necessarily be in full payment for all services rendered by him, if such services were of greater value than the amount of the salary.  So far as we have observed from the examination of the abstract, evidence was offered by the plaintiff as to the value of his services, but was excluded upon objection.  At all events, there is not sufficient evidence in the record to justify the judgment upon the ground of the value of the plaintiff's services.  The plaintiff should be allowed to amend his petition, if so advised, and count upon a *quantum meruit* upon payment of costs accrued to the time of making such amendment.

The judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED.

ROSE, FAWCETT and HAMER, JJ., not sitting.